******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# THE CONNECTICUT LIGHT AND POWER COMPANY *v.* PUBLIC UTILITIES REGULATORY AUTHORITY
## (SC 21122)

McDonald, D'Auria, Ecker, Alexander and Bright, Js.

*Syllabus*

Pursuant to the Uniform Administrative Procedure Act (§ 4-166 (5) (A)), a "final decision" is "the agency determination in a contested case," and a "contested case," pursuant to § 4-166 (4), is "a proceeding . . . in which the legal rights, duties or privileges of a party are required by state statute or regulation to be determined by an agency after an opportunity for hearing or in which a hearing is in fact held . . . ."

The plaintiff electric supplier, C Co., appealed from the judgment of the trial court, which had dismissed its administrative appeal from the decision of the defendant, the Public Utilities Regulatory Authority (PURA), in connection with PURA's investigation into C Co.'s response to an accident in the town of Norfolk. Downed electrical wires had entrapped the occupants of a vehicle that struck a utility pole owned and maintained by C Co., and, before first responders could rescue the occupants, they had to wait for approximately one hour until C Co.'s response specialist arrived at the scene and confirmed that certain electrical wires were de-energized. PURA thereafter issued a notice of proceeding, announcing that it was initiating an investigation into C Co.'s response to the accident. Following a hearing, at which C Co. participated, PURA issued its decision. PURA found that C Co.'s response to the accident had been imprudent and ordered C Co. to adopt a target response time of thirty minutes for certain life-threatening situations or "priority 1 events," including situations in which live wires on vehicles prevent first responders from performing rescue efforts. In dismissing C Co.'s administrative appeal, the trial court determined that it lacked subject matter jurisdiction because PURA's decision was not appealable under the provision (§ 4-183 (a)) of the Uniform Administrative Procedure Act allowing appeals from final agency decisions insofar as PURA's imprudence finding and target response time order were not determinations made in a "contested case" for purposes of § 4-166 (4). On appeal to this court, C Co. claimed that the trial court had incorrectly concluded that it lacked jurisdiction over its administrative appeal. *Held*:

The trial court properly dismissed C Co.'s administrative appeal from PURA's decision rendered in connection with its investigation into the accident for lack of subject matter jurisdiction, as that proceeding was not a "contested case" entitled to judicial review under § 4-183 (a) insofar as no state statute or regulation required PURA to determine C Co.'s rights, privileges, or duties after an opportunity for a hearing within the meaning of § 4-166 (4).

Neither of the statutes (§§ 16-14 and 16-18) on which C Co. relied in support of its claim that PURA was required to hold a hearing and to conduct the

proceeding as a contested case was applicable to the imprudence finding or the order regarding target response time that C Co. was challenging on appeal.

With respect to §16-14, which requires PURA to hold a hearing on any written "complaint" made by a town of "conditions resulting in [certain types of property damage] by electrolysis or by reason of the escape of electricity of any public service company," even if certain letters submitted to C Co. by the local fire chief and the chief of service of the local ambulance service constituted written complaints to PURA within the meaning of that statute, those letters did not allege the type of property damage contemplated by §16-14 but, rather, focused exclusively on C Co.'s response to the accident and the potential harm that C Co.'s response time had on the occupants trapped inside the vehicle.

Moreover, although §16-14 also allows PURA to issue such orders "as may be necessary to prevent" the type of property damage contemplated by that statute, PURA explained in its final decision that the reason for imposing the thirty minute target response time was "to better protect public safety," not to prevent the sort of property damage that §16-14 is intended to address, and, accordingly, PURA did not and could not have relied on §16-14 as authority for issuing the response time order.

With respect to §16-18, which authorizes PURA, after a public hearing, to require public service companies to move or consolidate their utility poles or wires along public highways when required by public convenience or necessity, PURA did not order the relocation or consolidation of any poles or wires, and the focus of its investigation was on C Co.'s response to and reporting of the accident, not the relocation or consolidation of utility infrastructure.

Furthermore, it was of no consequence that, in its notice of proceeding, PURA relied on §§16-14 and 16-18 as authority for initiating the investigation into the accident and convening the hearing, as the relevant inquiry for determining contested case status is not whether PURA noticed the proceeding pursuant to statutes requiring a contested hearing but whether the agency determinations and orders that C Co. challenged in its administrative appeal were required by state statute or regulation to be made or issued after a hearing.

To the extent that PURA, following the hearing, issued orders or made findings for which a hearing was not required, the hearing was gratuitous as to those orders and findings, and, when PURA conducts a hearing and the resulting decision includes both determinations that it was required by statute or regulation to make only after a contested hearing and other determinations that the law permitted it to make without any hearing, the mere fact that PURA addressed both sets of issues in a single proceeding does not convert every resulting determination into an appealable decision in a contested case.

C Co. could not prevail on its claim that PURA's own regulations (§§16-1-116 and 16-1-117) required PURA to conduct the underlying proceeding as a contested case.

Although §16-1-116 confers on PURA the discretionary authority "at any time [to] institute investigations," and §16-1-117 requires PURA to follow the procedures applicable to contested case proceedings when it elects to hold a hearing for purposes of an investigation, the application of those procedures to an otherwise gratuitous or discretionary hearing does not convert the proceeding into a contested case.

Rather, contested case status is limited under §4-166 (4) to proceedings in which an agency is "required by statute or regulation" to provide an opportunity for a hearing to determine a party's legal rights, duties, or privileges, and a gratuitously held hearing under §16-1-116, regardless of its procedural formality, does not satisfy that threshold requirement.

C Co. could not prevail on its claim that PURA's imprudence finding and its target response time order were required to be made in a contested case on the ground that PURA adjudicated C Co.'s legal rights, duties, or privileges for purposes of §4-166 (4), by issuing that order and making that finding.

PURA imposed the thirty minute target response time for priority 1 events pursuant to its supervisory authority under §16-11, which permits PURA to "order . . . such changes in the manner of operation [of any public service company], as may be reasonably necessary in the public interest," and, because neither §16-11 nor any other statute or regulation required PURA to conduct a hearing before imposing that response time, PURA had the authority to impose that response time in an uncontested case pursuant to §16-11.

With respect to C Co.'s claim that PURA's imprudence finding must be made in a contested case because PURA subsequently had used that finding to assess a penalty against C Co., C Co. was assessed a penalty not because of the imprudence finding but because PURA had determined, in a separate contested case proceeding, that C Co. had failed to file timely accident reports following the Norfolk accident.

To the extent that C Co. argued that PURA could use the imprudence finding to negatively affect C Co. in a future rate case, PURA conceded that its imprudence finding was not binding on C Co. in future proceedings and that C Co. would be permitted to litigate that issue should it arise in C Co.'s next rate case.

In addition, the fact that PURA adjudicated C Co.'s legal rights, duties, or privileges by making the imprudence finding and issuing the response time order did not trigger contested case status under §4-166 (4) in the absence of any statutory or regulatory requirement that it make those determinations only after an opportunity for a hearing.

Argued December 11, 2025—officially released April 28, 2026

*Procedural History*

Appeal from the decision of the defendant finding, inter alia, that the plaintiff's actions in response to a

motor vehicle accident were imprudent, brought to the Superior Court in the judicial district of New Britain, where the court, *Budzik, J.*, granted the motion to intervene filed by the Office of Consumer Counsel; thereafter, the court, *Budzik, J.*, granted the defendant's motion to dismiss and rendered judgment thereon, from which the plaintiff appealed. *Affirmed.*

*James J. Healy*, with whom were *Shivangi Bhatia* and *Daniel T. Crisp*, for the appellant (plaintiff).

*Robert L. Marconi*, assistant attorney general, with whom, on the brief, was *William Tong*, attorney general, for the appellee (defendant).

*Andrew W. Minikowski*, with whom, on the brief, was *Prabisha Bhandari*, for the appellee (intervenor Office of Consumer Counsel).

*Opinion*

BRIGHT, J. The plaintiff, The Connecticut Light and Power Company, doing business as Eversource Energy, appeals from the judgment of the Superior Court dismissing its administrative appeal for lack of subject matter jurisdiction. The administrative appeal arose from a decision in an investigation conducted by the defendant, the Public Utilities Regulatory Authority (PURA), into the plaintiff's response to an accident in the town of Norfolk, in which a motor vehicle struck the plaintiff's utility pole, causing the pole and electrical wires to fall onto the roadway and to entrap the occupants of the vehicle. The Superior Court concluded that PURA's investigatory proceeding, which included a hearing, did not constitute a "contested case" within the meaning of General Statutes § 4-166 (4) and therefore was not subject to judicial review pursuant to General Statutes § 4-183 (a).

On appeal to this court, the plaintiff challenges that determination. Specifically, the plaintiff argues that PURA was statutorily and regulatorily required to hold a hearing and to conduct the proceeding as a contested

case pursuant to General Statutes §§ 16-14 and 16-18, as well as §§ 16-1-116 and 16-1-117 of the Regulations of Connecticut State Agencies. In addition, with respect to General Statutes §§ 16-14 and 16-18, the plaintiff argues that PURA may not retroactively disclaim the applicability of those statutes to the investigation and hearing and characterize the proceeding as uncontested in an effort to insulate its final decision from judicial review. Finally, the plaintiff contends that PURA's final decision—particularly its finding that the plaintiff's response to the accident was imprudent and its order directing the plaintiff to adopt a thirty minute response time target for priority 1 events[1]—involved adjudicative determinations that can be made only in a contested case.

We are unpersuaded by the plaintiff's claims and conclude that the proceeding was not a contested case entitled to judicial review because no state statute or regulation required PURA to determine the plaintiff's rights, privileges, or duties after an opportunity for a hearing within the meaning of § 4-166 (4). We also reject the plaintiff's claim that, because PURA ordered a response time target and made a finding that the plaintiff acted imprudently, this was a contested case. Accordingly, we affirm the judgment of the Superior Court.

The record reveals the following relevant facts and procedural history. On January 17, 2023, at approximately 2:21 p.m., municipal first responders were dispatched to 599 East Greenwoods Road in Norfolk to respond to a motor vehicle accident (Norfolk accident). The motor vehicle left the roadway and struck a utility pole owned and maintained by the plaintiff. The collision caused the utility pole to break and resulted in downed electrical conductors in the vicinity of the vehicle, entrapping the two elderly occupants of the vehicle. First responders

[1] A priority 1 event is defined as "an event involving a life-threatening situation and includes events in which there is direct human contact with live wires or live wires on vehicles preventing emergency responders from performing rescue efforts, administering [first aid] treatment, or both, to persons who may be injured or [are] in danger of being injured."

arrived at the scene but did not approach the vehicle to extricate the occupants due to the fallen electrical wires.[2]

At approximately 2:23 p.m., the plaintiff's System Operations Center (SOC) received a call on the E-911 municipal emergency line from Litchfield County dispatch notifying the SOC about the accident. This call was designated a priority 1 call and lasted approximately seven minutes. During and immediately after the call, an SOC operator worked to de-energize the area through remote operation. Once remote de-energization was achieved, the SOC notified Litchfield County dispatch that the area should be de-energized but must nevertheless be treated as energized until one of the plaintiff's response specialists[3] arrived at the scene and manually tested the wires.

At the time of the priority 1 call, the plaintiff had four response specialists on duty in its zone encompassing the town of Norfolk. At 2:31 p.m., SOC assigned a response specialist who was located approximately twenty-six miles away from the accident. That specialist acknowledged the dispatch at 2:32 p.m., departed for Norfolk, and arrived at the scene of the accident at 3:17 p.m.[4] Between 3:17 and 3:30 p.m., the specialist worked with the SOC to successfully identify and de-energize the involved wires. At approximately 3:31 p.m., the Norfolk Volunteer Fire Department, Inc., began extrication efforts and removed the occupants from the vehicle at approximately 3:44 and 3:47 p.m., respectively. The occupants were then transported to trauma centers.

---

[2] Safety protocols for priority 1 events involving entrapment require first responders to wait for the electric company to confirm that the wires are de-energized before they can approach the vehicle and begin the extrication process.

[3] Response specialists are responsible for around-the-clock emergency response in coordination with the SOC. These specialists are organized across the system by zone, with the town of Norfolk located in zone 3. The SOC handles the dispatch of response specialists to emergency sites.

[4] The response specialist was informally dispatched to the general area of the Norfolk accident at 2:31 p.m., and he acknowledged the dispatch one minute later. He was then formally assigned to the E-911 ticket at 2:40 p.m., while he was enroute to the accident scene, and he acknowledged that ticket at 2:45 p.m.

On January 20, 2023, the plaintiff submitted an immediate accident report to PURA, notifying it of the January 17 accident in Norfolk. Several days later, on January 27, 2023, the plaintiff submitted a five day accident report.[5] PURA subsequently issued a notice of proceeding on January 30, 2023, informing the plaintiff that, "pursuant to [General Statutes] §§ 16-9, 16-11, 16-14, 16-15, 16-16, 16-17, 16-18, 16-19e, 16-244 and 16-244i, and regulations promulgated pursuant to said statutes," PURA was initiating a proceeding to investigate the Norfolk accident and the plaintiff's response thereto. The notice further stated that, as part of its investigation, PURA intended to "review the cause of, and [the plaintiff's] response to, the accident. The proceeding will be of broad scope and include, but not be limited to:

---

[5] Under General Statutes § 16-16, and §§ 16-16-1 through 16-16-4 of the Regulations of Connecticut State Agencies, public service companies must notify PURA of "any accident attended with personal injury or involving public safety, which was or may have been connected with or due to the operation of its property, or caused by contact with the wires of any public service company or electric supplier . . . ." General Statutes § 16-16 (a). For accidents classified as "major accidents," which include "[a]ny situations where energized downed wires trap members of the public in vehicles"; Regs., Conn. State Agencies § 16-16-2 (a) (10); the regulations require the utility company to file an immediate accident report within twenty-four hours after the occurrence or discovery of the accident; see id., § 16-16-3 (a); and another report within five business days after the occurrence or discovery of the accident. See id., § 16-16-3 (b). These reports must include, "to the extent known . . . (1) [i]dentification of persons making the report or notification, including name and contact information such as telephone numbers and business and email address; (2) [n]ames of all affected utilities; (3) [t]he exact time and location of the accident; (4) [a] description of the accident and extent of injuries, including total number of fatalities, if any; (5) [t]otal number of injured employees and any available information about the injured employees such as job title, age and contact information; (6) [t]otal number of injured persons other than the utility's employees, with any available information such as name, age and contact information; (7) [a]ll known significant facts or information relevant to the cause of the accident or the extent of the injuries or damages; (8) [a]ctions already taken by the utility at the time of the report, and immediate actions the utility plans to undertake with regard to the accident; and (9) [c]orrective actions, if any, taken or planned by the utility to mitigate future similar occurrences." Id., § 16-16-3 (e). General Statutes § 16-16 (c) authorizes the imposition of civil penalties for failure to comply with accident reporting requirements.

incident and accident reporting, including whether [the plaintiff] violated the major accident reporting requirements of [§§] 16-16-1 through 16-16-4 of the Regulations of Connecticut State Agencies; emergency response actions; adequacy of staffing, management, and equipment; communications and coordination with the public, state, and regulatory agencies, first responders, and municipal elected officials; the operation, maintenance, and condition of [the plaintiff's] plant; and the manner of the [plaintiff's] operation of its plant to provide safe and reliable service and [to] provide for the safety of the public and the [plaintiff's] employees." In the notice of proceeding, PURA referred to the investigation as "an uncontested matter . . . ." It noted, however, that PURA may, in a subsequent contested proceeding, impose civil penalties in accordance with General Statutes § 16-41.[6] The notice required the plaintiff to conduct a detailed root cause analysis, which the plaintiff submitted on February 28, 2023, and to maintain and preserve detailed records related to the Norfolk accident and the plaintiff's response thereto. PURA also issued interrogatories to the plaintiff as part of its investigation, to which the plaintiff responded.

Subsequently, on April 6, 2023, PURA conducted a remote evidentiary hearing in which the plaintiff participated. In the notice of hearing, PURA stated that the purpose of the hearing was to "investigate the major accident and [the plaintiff's] response to, and reporting of, the major accident," and repeated the same statutory and regulatory authority on which it had relied in the notice of proceeding, including §§ 16-14 and 16-18, and the regulations promulgated pursuant thereto. PURA recognized the town of Norfolk as a formal participant

[6] Section 16-41 allows PURA to enforce title 16 of the General Statutes by imposing civil penalties on certain regulated entities, including public utility companies, for failure to comply with the provisions of title 16 or with PURA orders or regulations issued pursuant to that title. See General Statutes § 16-41 (a). Before assessing a penalty, PURA must provide notice and an opportunity for a hearing. See General Statutes § 16-41 (c). If no hearing is requested within twenty days of receiving notice, however, the notice becomes a final order. See General Statutes § 16-41 (d).

in the proceeding. PURA's Office of Education, Out-reach and Enforcement, the Office of Consumer Counsel (OCC), and the commissioner of energy and environ-mental protection also were recognized as participants in the proceeding.

Following the hearing, PURA issued a proposed final decision, to which the participants were given the oppor-tunity to file written exceptions.[7] On August 9, 2023, PURA issued its final decision, finding that the plain-tiff's actions in response to the Norfolk accident were "imprudent" and resulted in a delayed response. As a result of these findings, PURA directed the plaintiff to adopt a response time target of thirty minutes for all priority 1 calls and to review and revise its accident response and reporting procedures to ensure compliance with state law.[8]

The plaintiff filed an administrative appeal from PURA's decision in the Superior Court pursuant to Gen-eral Statutes §§ 4-183 (a) and 16-35 (a).[9] PURA filed a motion to dismiss, claiming that the court lacked subject matter jurisdiction to hear the administrative appeal because PURA's decision was not issued in a contested case. The court agreed with PURA that the decision the plaintiff sought to challenge resulted from an investi-gation and hearing conducted in an uncontested case, explaining that "the statutes and regulations cited by [the plaintiff] are either inapplicable, or merely per-mit—but do not *require*—PURA to hold a hearing on the [challenged] investigation . . . ." (Emphasis in original.)

---

[7] The plaintiff filed written exceptions to PURA's proposed final deci-sion on July 24, 2023, asking PURA to reconsider its conclusions that "(1) the [plaintiff's] response was delayed due to imprudent actions taken by the [plaintiff] in response to the emergency; (2) the [plain-tiff's] reporting of the [a]ccident to PURA violated certain applicable statutes and standards; and (3) the result of the 'imprudent response' is a 'prospective standard and consequences for when the [plaintiff's] response times exceed the standard.' "

[8] PURA also found that the plaintiff's reporting of the Norfolk accident was deficient and may have violated Connecticut law. That finding is not at issue in this appeal.

[9] The trial court granted the OCC's motion to intervene in the admin-istrative appeal, and, on appeal to this court, the OCC filed a brief in support of PURA's position and participated in oral argument.

Accordingly, the court granted PURA's motion to dismiss the administrative appeal.

The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

I

On appeal, the plaintiff contends that the Superior Court erred in concluding that it lacked subject matter jurisdiction because the administrative proceeding at issue, which included an evidentiary hearing, qualifies as a contested case, as defined in § 4-166 (4).

It is well established that, "because [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary." (Internal quotation marks omitted.) *High Watch Recovery Center, Inc.* v. *Dept. of Public Health*, 347 Conn. 317, 327, 297 A.3d 531 (2023). Our resolution of this issue first requires a brief discussion of the statutory scheme that governs administrative appeals under the Uniform Administrative Procedure Act (UAPA). See id., 327–28.

Judicial review of administrative action under the UAPA is limited. "There is no absolute right of appeal to the courts from a decision of an administrative agency. . . . Appeals to the courts from administrative [agencies] exist only under statutory authority . . . . Appellate jurisdiction is derived from the . . . statutory provisions by which it is created, and can be acquired and exercised only in the manner prescribed." (Internal quotation marks omitted.) Id., 328. Section 4-183 (a) permits an appeal to the Superior Court only by a "person who has exhausted all [available] administrative remedies" and "is aggrieved by a final decision . . . ." A "final decision" is statutorily defined as "(A) the agency determination in a contested case, (B) a declaratory ruling issued by an agency pursuant to section 4-176, or (C) an agency decision made after reconsideration." General Statutes § 4-166 (5). The plaintiff does not claim that PURA's challenged ruling

constituted a declaratory judgment or a decision made after reconsideration. Accordingly, whether the trial court had jurisdiction turns on whether the challenged ruling constitutes a determination in a contested case.

Section 4-166 (4) defines a "contested case" in relevant part as "a proceeding, including but not restricted to rate-making, price fixing and licensing, in which the legal rights, duties or privileges of a party are required by state statute or regulation to be determined by an agency after an opportunity for hearing or in which a hearing is in fact held . . . ." This definition reflects the legislature's choice to confine judicial review to a defined category of agency adjudications and to exclude other forms of administrative decision-making from appellate oversight. See *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection,* 226 Conn. 792, 800, 629 A.2d 367 (1993).

Furthermore, the language of § 4-166 (4) notwithstanding, "[n]ot every matter or issue determined by an agency qualifies for contested case status. . . . [W]e have determined that even in a case [in which] a hearing is in fact held, in order to constitute a contested case, a party to that hearing must have enjoyed a statutory [or regulatory] right to have his legal rights, duties or privileges determined by that agency holding the hearing. . . . [When] no party to a hearing enjoys such a right, the Superior Court is without jurisdiction over any appeal from that agency's determination." (Internal quotation marks omitted.) *Ferguson Mechanical Co.* v. *Dept. of Public Works*, 282 Conn. 764, 771–72, 924 A.2d 846 (2007).[10] Thus, "[t]he test for determining contested case status [is] . . . well established and requires an inquiry into

---

[10] We have noted that, "although the definition of 'contested case' in § 4-166 [4] is a grammatical quagmire, the legislative history and policy underlying it suggest that we interpret the 'hearing is in fact' language as being intrinsically connected to the 'required by statute' language therein so that in order for a hearing to result in a contested case, the hearing must be statutorily required to be held by the agency." *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, supra, 226 Conn. 808.

three criteria, to wit: **(1)** whether a legal right, duty or privilege is at issue, **(2)** and is statutorily [or regulatorily] required to be determined by the agency, **(3)** through an opportunity for hearing or in which a hearing is in fact held." (Internal quotation marks omitted.) *High Watch Recovery Center, Inc.* v. *Dept. of Public Health*, supra, 347 Conn. 328. "Under this test, if an agency is not statutorily [or regulatorily] required to hold a hearing, but nonetheless holds a hearing gratuitously, a contested case does not arise." *Middlebury* v. *Dept. of Environmental Protection*, 283 Conn. 156, 164, 927 A.2d 793 (2007).

Accordingly, the controlling consideration in a case such as this, in which a hearing was in fact held, is whether the legislature *requires* that the agency make the determination at issue only after conducting a hearing. "The legislature has the primary and continuing role in deciding which class of proceedings should enjoy the full panoply of procedural protections afforded by the UAPA to contested cases, including the right to appellate review by the judiciary. Deciding which class of cases qualifies for contested case status reflects an important matter of public policy and the primary responsibility for formulating public policy must remain with the legislature." (Internal quotation marks omitted.) *High Watch Recovery Center, Inc.* v. *Dept. of Public Health*, supra, 347 Conn. 328–29. Although the hearing requirement is typically imposed by statute, in 2004, the legislature amended the definition of a "contested case" in §4-166 to expand the category of agency proceedings subject to judicial review to proceedings in which a hearing is "required by state statute *or regulation* . . . ." (Emphasis added.) Public Acts 2004, No. 04-94, §1. This amendment broadened the sources of law capable of triggering contested case status by recognizing that a mandatory duty to hold a hearing to adjudicate a party's legal rights, duties, or privileges may arise from regulations as well as from statutes.

Nevertheless, when there is no statutory or regulatory requirement for a hearing, contested case status is absent, the agency action is not a final decision within the meaning of § 4-183 (a), and the Superior Court lacks subject matter jurisdiction to entertain an administrative appeal. See *High Watch Recovery Center, Inc.* v. *Dept. of Public Health*, supra, 347 Conn. 328–29; see, e.g., *Ferguson Mechanical Co.* v. *Dept. of Public Works*, supra, 282 Conn. 778–79.

The plaintiff contends that the administrative proceeding in the present case qualifies as a contested case, as defined in § 4-166 (4), because PURA was required by General Statutes §§ 16-14 and 16-18, and §§ 16-1-116 and 16-1-117 of the Regulations of Connecticut State Agencies, to hold a hearing before adjudicating the plaintiff's legal rights, duties, or privileges.

II

We first turn to the plaintiff's statutory claim. "To ascertain whether a statute requires an agency to determine the legal rights, privileges or duties of a party, [courts] need to examine all the statutory provisions that govern the activities of the particular agency or agencies in question." (Internal quotation marks omitted.) *High Watch Recovery Center, Inc.* v. *Dept. of Public Health*, supra, 347 Conn. 329. It is undisputed that §§ 16-14 and 16-18 provide for a hearing and, when applicable, require PURA to determine the rights of the parties pursuant to those statutes in a contested case. The question, however, is whether those statutes provided the basis of any order that the plaintiff is challenging. The inclusion of those statutes in a notice of proceeding or notice of hearing, and even conducting a hearing to determine whether there was a violation of those statutes, does not, without more, give rise to a contested case regarding other issues that are determined by the agency during the proceeding if a hearing was not required on those specific issues. Rather, contested case status is conferred only when the statutes relied on by PURA to make findings and orders are applicable to the proceeding and require

PURA to determine a party's rights, privileges, or duties in the manner contemplated by those statutes. See, e.g., *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, supra, 226 Conn. 802–806. When the factual conditions that trigger the application of §§ 16-14 and 16-18 are not present and PURA does not exercise the specific powers those statutes confer, a reference to those statutes in preliminary notices cannot transform the proceeding that is the subject of the plaintiff's appeal into a contested case under § 4-166 (4).

Therefore, the resolution of this issue turns not on whether §§ 16-14 and 16-18 were referenced in PURA's notices, investigation, and hearing, but on whether the specific agency determinations that the plaintiff challenged in the Superior Court were required to be adjudicated after an opportunity for a contested hearing. For the following reasons, we conclude that they were not.

A

To the extent that the plaintiff argues that both §§ 16-14 and 16-18 apply to the underlying proceeding and that PURA exercised the authority conferred by those statutes in making the determinations challenged on appeal, we are not persuaded. Neither § 16-14 nor § 16-18 can reasonably be read to require PURA to make findings of prudence or to issue orders directing a regulated utility to shorten its accident response time in the interest of protecting public safety.

Section 16-14 creates a specific mechanism for consideration of claims arising from injuries to certain property caused by electrolysis or escaped electricity. In substance, the statute permits "[a]ny town, city or borough, or any person or corporation maintaining pipes, conductors or other structures under or above ground in the streets or highways, or owning cattle . . . [to] make [a] complaint in writing to [PURA] of conditions resulting in injury to or destruction of such pipes, conductors, structures or cattle by electrolysis or by reason of the escape of electricity of any public service company or electric supplier."

General Statutes §16-14. If a complaint is made, the statute directs that "[p]roceedings shall be had upon such complaint as provided in sections 16-12 and 16-13," and further authorizes PURA, after a hearing, to "make such order as may be necessary to prevent such injury or destruction . . . ." General Statutes §16-14.

The following additional facts are relevant to whether the issues the plaintiff raised in its appeal to the Superior Court arise out of an order issued or decision made by PURA pursuant to §16-14. The day after the Norfolk accident, the fire chief of Norfolk Volunteer Fire Department, Inc., and the chief of service of Norfolk Lions Club Ambulance submitted written letters to the plaintiff expressing concerns regarding the plaintiff's response to the accident. The letters criticized the length of time it took for the plaintiff to respond to the accident and to confirm de-energization, and asserted that the delayed response impeded first responders' ability to extricate and provide timely medical care to the occupants of the vehicle.[11] These letters are included in the administrative record, and PURA referenced them in its final decision.

The plaintiff contends that the letters from the fire chief and the chief of service constitute written complaints by the town of Norfolk within the meaning of §16-14. PURA responds that §16-14 is inapplicable because no written complaint was made to PURA itself,

---

[11] Specifically, the fire chief's letter stated that the occupants of the vehicle were trapped and had sustained multiple injuries, that the vehicle was smoking, and that critical care helicopter service was required. The letter further explained that one of the emergency helicopters was forced to cancel due to "the prolonged extrication" process and incoming inclement weather. The fire chief criticized the plaintiff's inability to confirm that the correct electrical grid had been de-energized and asserted that, despite the accident occurring on a weekday during normal working hours, it took approximately one hour for the plaintiff to respond to a state road emergency.

The letter from the chief of service similarly emphasized response time concerns. It explained that first responders aim to extricate passengers within ten minutes of the time the injury occurs and to deliver them to trauma centers within sixty minutes, and emphasized that the plaintiff's delayed response forced the injured occupants "to wait while pinned inside of a car . . . ." It further opined that, given the size of the

and the investigation was initiated in response to the plaintiff's accident report rather than in response to any complaint. PURA further maintains that the substance of the letters does not fall within the scope of § 16-14.

Section 16-18 confers a different kind of authority. It provides in relevant part that PURA "shall have power, after notice to the companies interested and public hearing, to require any public service company or certified telecommunications provider maintaining a line or lines of poles and wires in this state to change the location of such poles and wires in the public highways whenever public convenience or necessity requires such change . . . ." General Statutes § 16-18. It also authorizes PURA, when multiple entities maintain lines of poles and wires along the same street, to require their wires to be strung on one or more shared pole lines, as PURA determines. See General Statutes § 16-18.

We agree with PURA that neither § 16-14 nor § 16-18 is applicable to the proceeding at issue or the orders challenged by the plaintiff. With respect to § 16-14, even if we assume that the letters could be characterized as written complaints made to PURA from the town of Norfolk,[12] their substance does not fall within the scope of § 16-14, which is expressly concerned with PURA's

state, the plaintiff should always have personnel positioned to respond within fifteen to twenty minutes of any priority 1 event.

Following the receipt of the letters, the plaintiff responded and met with Norfolk town officials on January 30, 2023. At that meeting, the plaintiff explained its priority 1 response procedures, committed to continued efforts to improve response times, and discussed the possibility of conducting public safety training.

[12] The record contains no evidence that the fire chief or the chief of service sent their letters to PURA prior to PURA's instituting the investigation; rather, PURA claims to have received copies of these letters for the first time pursuant to interrogatories conducted as part of the investigation. In its notice of proceeding, PURA expressly stated that the investigation into the Norfolk accident and the plaintiff's response thereto was initiated "[i]n response to the [a]ccident [r]eport" filed by the plaintiff. Nevertheless, the plaintiff contends that the letters received local news coverage, suggesting that PURA may have been aware of them prior to conducting interrogatories. Because we conclude that the statute does not apply to the substance of the

specific ability to make orders preventing injury or destruction to "pipes, conductors, structures or cattle" when such harm is alleged in a written complaint. The complaints made by the fire chief and chief of service did not allege any injuries to or destruction of *property* but instead focused exclusively on the plaintiff's response to the accident and the potentially harmful impact that the plaintiff's response time had on the *people* trapped inside the vehicle who needed medical attention. These grievances, although relevant to public safety and emergency response practices, do not implicate the type of property damage caused by electrolysis or the escape of electricity that § 16-14, by its terms, is intended to address. Likewise, PURA explained in its final decision that its order directing the plaintiff to adopt a thirty minute target response time for priority 1 events is intended to address deficiencies in the plaintiff's response to accidents like the Norfolk accident and "to better protect public safety." Nothing in the record suggests that PURA issued this order because it believed that it was "necessary to prevent . . . injury [to] or destruction" of "pipes, conductors, structures or cattle by electrolysis or by reason of the escape of electricity . . . ." General Statutes § 16-14.

Similarly, with respect to § 16-18, the statute's plain text links the public hearing requirement to orders "to change the location of . . . poles and wires" or to consolidate attachments on pole lines. In this case, PURA's final decision did *not* order the relocation, consolidation, or reconfiguration of any poles or wires. Further, the focus of the investigation was not the siting of utility infrastructure for public convenience or necessity but, rather, the plaintiff's response to and reporting of the Norfolk accident. The fact that a utility pole and wires were involved in the underlying accident does not, without more, bring the proceeding within the ambit of § 16-18, which is directed to prospective determinations about pole and wire placement along public highways.

letters, we need not determine whether they were "complaint[s] [made] in writing to [PURA]" for purposes of § 16-14.

As PURA concluded in a footnote in its final decision, despite the plaintiff's assertion that PURA was required to conduct the proceeding as a contested case because its notices cited to §§ 16-14 and 16-18, "neither [statute was] ultimately applicable to [PURA's] specific determinations and orders. Although those statutes require a hearing under certain circumstances, such circumstances are not present here ([and] the [plaintiff does not] allege as much). Importantly, the mere reference to a statute in a notice of proceeding does not obviate the statutory prerequisites for the application of the statute."[13] We agree.

Although the plaintiff does not contend that PURA made the specific types of orders contemplated by §§ 16-14 and 16-18, the plaintiff nevertheless argues that the proceeding was a contested case because PURA relied on § 16-14 "to 'make . . . further investigation into the alleged conditions' set forth in the [fire chief's and chief of service's letters] . . . and ultimately [to] render 'such order[s] as may be necessary to prevent' future concerns . . . ." (Citations omitted.) We are not persuaded. As we discussed, § 16-14 applies only to written complaints alleging injury to or destruction of certain property caused by electrolysis or the escape of electricity, and it permits PURA, after a hearing, to "make such order as may be necessary to prevent *such injury or destruction* . . . ." (Emphasis added.) The statute therefore limits PURA's authority to making orders aimed at preventing that specific property related harm. Because PURA's order regulating the plaintiff's priority call response time is not intended to prevent property damage of the kind described in § 16-14, it is not among the types of orders authorized by the statute. PURA neither relied on nor

---

[13] PURA claims that its citation to §§ 16-14 and 16-18 in its initial notices was erroneous. The plaintiff disputes that claim, arguing that PURA's claim of error is hard to accept given that the reference was not only in PURA's initial notice of proceeding but also in its notice of hearing, which was not issued until after it had conducted a preliminary investigation. Resolution of this particular dispute is immaterial to our analysis.

could properly rely on § 16-14 as authority for ordering the plaintiff to reduce its response time in this context.

## B

Alternatively, the plaintiff contends that, once PURA noticed the proceeding pursuant to §§ 16-14 and 16-18, which both require PURA to hold a contested hearing prior to exercising its authority under those statutes, PURA could not later conclude that those statutes were inapplicable and retroactively disavow contested case status.[14] We disagree. As we explained previously, the relevant inquiry is not whether PURA noticed the proceeding pursuant to statutes requiring a contested hearing but whether the agency determinations that the plaintiff challenged in the Superior Court were required by state statute or regulation to be made after a hearing.

Contested case status does not attach to all actions taken by an agency following a hearing simply because the agency noticed the proceeding pursuant to statutes

---

[14]In addition to §§ 16-14 and 16-18, the notices cited § 16-9 (requiring written decisions and orders, but requiring hearings only if PURA rescinds, reverses, or alters any prior decision), § 16-11 (requiring PURA to oversee utility plants, equipment, and operations, and permitting it to order improvements and changes "in the public interest"), § 16-15 (mandating compliance with PURA orders made pursuant to General Statutes §§ 16-13 and 16-14 and imposing penalties for companies' noncompliance with such orders), § 16-16 (setting forth accident reporting requirements for regulated entities and penalties for their noncompliance), § 16-17 (requiring PURA to investigate and make record of fatal and certain other accidents), § 16-19e (setting forth regulatory principles governing transfers of assets, plant expansion, internal management, and level and structure of rates, and specifying public hearing requirements in certain rate related contexts, including express contested case requirement in subsection (g)), § 16-244 (legislative findings and policy declarations concerning electric restructuring), and § 16-244i (mandating PURA's continuing regulatory oversight and specifying service obligations of electric distribution companies). None of these statutes—with the exception of the express hearing provisions in § 16-19e (g) and the limited circumstance identified in § 16-9—requires a hearing, and the plaintiff does not rely on any of these statutes in this appeal. Similarly, although the notices cited to § 16-19e, which governs rate-making proceedings that qualify as contested cases under § 4-166 (4), there is no claim that the proceeding at issue was a rate-making proceeding.

or regulations requiring a hearing; it attaches only to those orders as to which the law requires a contested hearing. Accordingly, even if PURA initially intended to exercise its authority under §16-14 or §16-18, or any other statute or regulation requiring a contested hearing, when it instituted the investigation and hearing, the proceeding would have been a contested case only with respect to the issues for which a hearing was statutorily required. To the extent that, following the hearing, PURA issued orders as to which a hearing was not required, the hearing was gratuitous. Thus, PURA did not retroactively "disavow" contested case status, as the plaintiff contends; such status never attached to the orders at issue merely because PURA relied in part on §§16-14 and 16-18 as bases for its investigation and hearing.

When PURA conducts a hearing and the resulting decision includes *both* determinations that the agency is statutorily or regulatorily required to make only after a contested hearing and other determinations that the governing law permits the agency to make without any hearing, the mere fact that PURA addresses both sets of issues in a single proceeding does not convert every resulting determination into an appealable decision in a contested case. The scope of appellate review is defined by legislative command, not by the agency's choice to address multiple matters in one proceeding. Only those determinations the legislature has expressly conditioned on a contested hearing are subject to appellate review. To conclude otherwise would impermissibly expand judicial review by allowing determinations that the legislature chose to insulate from appeal to become reviewable merely because they were made in the same proceeding as a contested matter. That result would not only contravene legislative intent but also would undermine agency efficiency. When, in the course of a properly convened contested hearing, the agency learns of circumstances that warrant the exercise of its authority under other statutes or regulations that do not require a hearing, it need not initiate separate uncontested proceedings to exercise that authority. Nothing in the law prevents the

agency from conducting a hearing that is mandatory as to some issues and gratuitous as to others. An agency determination is "contested" because the governing statute or regulation makes it so—not because it was made in the same proceeding as other contested matters.

Thus, had PURA, in its final decision, issued an order to prevent destruction to property in the manner contemplated by §16-14, required the plaintiff to relocate or consolidate its poles or wires as authorized by §16-18, or otherwise adjudicated the plaintiff's rights, duties, or privileges pursuant to a statute or regulation that required a contested hearing, we agree that such determinations would qualify as appealable final decisions in a contested case. However, even in that circumstance, the two determinations that the plaintiff challenges on appeal in the present case would not be agency determinations entitled to judicial review under §4-166 (4) simply because they were made in the same proceeding.

Accordingly, the plaintiff's argument that it can appeal from the agency determinations made in the present case because PURA initially noticed the investigation and convened the hearing relying, in part, on two statutes that mandated a contested case hearing, is unavailing. Whether certain agency determinations qualify as contested case determinations entitled to judicial review depends not on the authority that the agency relied on in instituting the proceeding, but on the authority that the agency relied on to make its findings and issue its ultimate orders. In part IV of this opinion, we consider whether the two specific determinations that the plaintiff challenges on appeal are determinations that PURA is required to make by state statute or regulation after an opportunity for a hearing.

### III

The plaintiff next argues that, independent of any statutory hearing requirement, PURA's own regulations mandated that the proceeding be conducted as a contested case. We are not persuaded.

The plaintiff relies on two PURA regulations—§§ 16-1-116 and 16-1-117. Section 16-1-116 of the Regulations of Connecticut State Agencies provides in relevant part that PURA "*may* at any time institute investigations at the direction of the commissioners. . . ." (Emphasis added.) The regulation's use of the permissive term "may" confers discretionary authority on PURA to initiate investigations, but it does not require it to do so. See, e.g., *Stone* v. *East Coast Swappers, LLC*, 337 Conn. 589, 601, 255 A.3d 851 (2020) (word "may" signifies "permissive conduct and the conferral of discretion" (internal quotation marks omitted)); see also *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, 252 Conn. 115, 122, 742 A.2d 1257 (2000).

Section 16-1-117 of the Regulations of Connecticut State Agencies provides that "[t]he rules of practice and procedure set forth in article 2 govern any hearing held for the purpose of such an investigation." This provision prescribes the procedures that PURA follows when conducting a hearing *if* PURA elects to hold one pursuant to an investigation. Article 2 of title 16 of the regulations establishes the procedures applicable to contested case proceedings conducted by PURA and includes provisions governing participation, notice, hearings, evidentiary submissions, briefing, and the issuance of final decisions. See Regs., Conn. State Agencies § 16-1-16 et seq. The plaintiff contends that, even if PURA had discretion as to whether to institute an investigation and to conduct a hearing regarding the adequacy of the plaintiff's response to the Norfolk accident, once it decided to do so, § 16-1-117 affirmatively required it to conduct the hearing held pursuant to such investigation as a contested case. In the plaintiff's view, because § 16-1-117 leaves the agency with no discretion over the degree of procedural formality with which to conduct the hearing, this matter differs from other gratuitous hearing cases.

Although there is no dispute that article 2 sets forth the procedures applicable in contested cases, the application of those procedures to an otherwise discretionary

hearing does not convert that proceeding into a contested case. As we have repeatedly held, "contested case status [is limited] to proceedings in which an agency is *required by statute* [*or regulation*] to provide an opportunity for a hearing to determine a party's legal rights or privileges." (Emphasis altered; internal quotation marks omitted.) *High Watch Recovery Center, Inc.* v. *Dept. of Public Health*, supra, 347 Conn. 329. A gratuitously held hearing, regardless of its procedural formality, does not satisfy this threshold requirement. See, e.g., *Middlebury* v. *Dept. of Environmental Protection*, supra, 283 Conn. 164–65; *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, supra, 226 Conn. 808–10; *New England Dairies, Inc.* v. *Commissioner of Agriculture*, 221 Conn. 422, 427–29, 604 A.2d 810 (1992); *Herman* v. *Division of Special Revenue*, 193 Conn. 379, 386–87, 477 A.2d 119 (1984).

The plaintiff's reading of § 16-1-117 would effectively convert into a contested case *any* investigation in which the agency elects to hold a hearing. This argument ignores the difference between a requirement to hold a hearing and a requirement that a hearing, if held, must be conducted according to certain procedures. Only the former requirement confers status as a contested case. See *Walenski* v. *State Employees Retirement Commission*, 185 Conn. App. 457, 470–72, 197 A.3d 443 (concluding that benefits denial hearing did not qualify as contested case because, although applicable regulations provided that "[a]ll hearings conducted in the state employees' retirement commission are conducted in accordance with the requirements of and procedures" used in contested cases, regulations did not explicitly require hearing, instead allowing commission to schedule claimant to appear "if warranted" (emphasis omitted; internal quotation marks omitted)), cert. denied, 330 Conn. 951, 197 A.3d 390 (2018). Accordingly, although §§ 16-1-116 and 16-1-117 certainly permit PURA to conduct a hearing in connection with an investigation—as it did in the present case—and provide that any such hearing be conducted with the same formal procedures used in contested cases, they do not *require* PURA to provide a

hearing as a prerequisite to agency action. Accordingly, PURA's decision to provide a gratuitous hearing, even if it was required to follow formal procedures when conducting it, does not create a contested case.

## IV

Finally, the plaintiff claims that PURA's response time order and imprudence finding were required to be made in a contested case because "PURA adjudicated the [plaintiff's] 'legal rights, duties [and] privileges'" within the meaning of §4-166 (4) and because PURA has consistently made prudence determinations in contested cases. We are not persuaded.

In its final decision, PURA, pursuant to its supervisory authority under §16-11, directed the plaintiff to reduce its target response time for priority 1 calls to thirty minutes. Section 16-11 permits PURA to "order . . . such changes in the manner of operation [of any public service company], as may be reasonably necessary in the public interest."[15] Because §16-11 does not include a hearing requirement, PURA has issued such orders in uncontested cases on several occasions. See, e.g., Decision and Order, Public Utilities Regulatory Authority, "Joint Application of CTS Energy, LLC and CL&P for Review and Approval of a Proposed Renewable Power Purchase Agreement under Section 127 of P.A. 11-80—Assignment of PPA," Docket No. 13-06-27RE01 (October 14,

---

[15] General Statutes §16-11 provides: "[PURA] shall, so far as is practicable, keep fully informed as to the condition of the plant, equipment and manner of operation of all public service companies and persons involved in the transportation of gas, as such terms are defined in section 16-280a, in respect to their adequacy and suitability to accomplish the duties imposed upon such companies by law and in respect to their relation to the safety of the public and of the employees of such companies or persons. [PURA] may order such reasonable improvements, repairs or alterations in such plant or equipment, or such changes in the manner of operation, as may be reasonably necessary in the public interest. The general purposes of this section and sections 16-19, 16-25, 16-43 and 16-47 are to assure to the state of Connecticut its full powers to regulate its public service companies, to increase the powers of [PURA] and to promote local control of the public service companies of this state, and said sections shall be so construed as to effectuate these purposes."

2016) pp. 1–4 (exercising supervisory authority under §16-11, among other statutes, in uncontested proceeding to direct regulated utility to consent to power purchase agreement assignment after finding its refusal "unreasonable" and contrary to public interest); Decision and Order, Public Utilities Regulatory Authority, "UI Petition for Relief with Respect to 900 Chapel Square Vault," Docket No. 16-01-41 (August 24, 2016) pp. 1–5 (exercising supervisory authority under §16-11 in uncontested proceeding to approve negotiated settlement agreement providing for construction of new electrical vault, allocating associated costs among affected parties, and addressing identified safety hazards and potential outage risks, upon determining that approval of agreement was "in the public interest").

In the present case, PURA exercised its supervisory authority under §16-11 after determining that changes to the plaintiff's operational practices were necessary in the public interest. In imposing the directive, PURA concluded that the plaintiff's existing, sixty minute response target was insufficient, reasoning that, although it "understands the [plaintiff's] hesitation with imposing response deadlines, [p]riority 1 events are life-threatening events that require the [plaintiff's] immediate response . . . ."[16] Based on the evidence in the record, including the plaintiff's response time data and the timeline of its response to the Norfolk accident, PURA determined that a response time target of thirty minutes for priority 1 calls was "reasonable and appropriate to better protect public safety."[17]

[16] PURA further explained that, especially during priority 1 events involving entrapment, such as the Norfolk accident, it is critical for the plaintiff to respond promptly because first responders cannot approach the vehicle or extricate trapped individuals until the plaintiff arrives and confirms de-energization. PURA also acknowledged that the plaintiff's existing, sixty minute target encompassed the entire "golden hour"—that is, the time frame within which first responders strive to extricate and transport victims to trauma centers following first response to the scene.

[17] PURA explained that "[f]ailure to meet the [thirty minute] [t]arget . . . may be indicative of a deficient response or a deficient system for [p]riority 1 calls."

Because there is no statute or regulation that required PURA to conduct a hearing before issuing this directive, we conclude that PURA had the ability to impose the thirty minute target in an uncontested case pursuant to its authority under §16-11.[18] Accordingly, the order imposing the thirty minute target does not qualify as an agency determination made in a contested case.

PURA also found that the plaintiff's procedures and actions in response to the Norfolk accident were "imprudent . . . ." According to the plaintiff, this finding was used to assess a penalty against the plaintiff in a later contested proceeding regarding its accident reports and could be used by PURA to negatively affect the plaintiff in a future rate case when determining the level and structure of rates that the plaintiff will be permitted to

---

[18] See, e.g., Decision and Order, Public Utilities Regulatory Authority, "PURA Investigation into Distribution System Planning of the Electric Distribution Companies—Non-Wires Alternatives," Docket No. 17-12-03RE07 (November 9, 2022) pp. 1, 5 (exercising authority under §§16-11, 16-19e and 16-244i in uncontested proceeding to implement non-wires solutions process governing how electric distribution companies plan and evaluate distribution system upgrades, and finding such process necessary to ensure that distribution system improvements "are made with economy, consider the need for energy conservation and energy efficiency, are prudent and in the public interest, and . . . do not result in rates that are more than just, reasonable, and adequate"); Decision and Order, Public Utilities Regulatory Authority, "PURA Investigation into Distribution Planning of the Electric Distribution Companies—Innovative Technology Applications and Programs (Innovation Pilots)," Docket No. 17-12-03RE05 (March 30, 2022) pp. 1, 4–5 (exercising "its broad statutory powers and obligations under . . . §§16-11 and 16-244i," in uncontested proceeding, to establish innovative energy solutions program, and finding that "a long-term, statewide, comprehensive, and strategic program framework is essential and necessary to encourage and advance the deployment of innovative clean energy technologies" and is "in the public interest"); Decision and Order, Department of Public Utility Control, "DPUC Investigation of the Process and Criteria for Use in Implementing Section 50 of Public Act 07-242—Peaking Generation," Docket No. 07-08-24 (December 14, 2007) pp. 4, 24–25 (invoking its "broad general authority" under §16-11 in uncontested proceeding to order electric distribution companies to enter into contracts with privately developed peaking generation projects to be selected in subsequent contested proceeding, finding such contracts "in the best interests of ratepayers").

charge. Thus, the plaintiff argues that a prudence determination must be made in a contested case. We disagree.

The imprudence finding was not the basis of the penalty assessed against the plaintiff in the separate proceeding. Following its final decision in the present case, PURA instituted a separate contested case proceeding in which it issued a notice of violation and assessed a civil penalty of $12,500 against the plaintiff *for its failure to file timely accident reports as set forth in the investigation.* See Decision and Order, Public Utilities Regulatory Authority, "PURA Consideration of Civil Penalty and Enforcement Action Against the Connecticut Light and Power d/b/a Eversource Energy After Investigation of the Accident," Docket No. 23-01-39RE01 (January 10, 2024) pp. 1–3, 10. The civil penalty had nothing to do with the plaintiff's response time to the accident.[19]

With respect to the possibility of future effects of the imprudence finding, the plaintiff contends that, due to the risk of accompanying negative impacts, PURA's own internal policy, as reflected in several of its decisions, is to make prudence determinations exclusively in contested cases. The plaintiff cites to three PURA decisions in particular. See Decision and Order, Public Utilities Regulatory Authority, "Investigation into Electric Distribution Companies' Preparation for and Response to Tropical Storm Isaias," Docket No. 20-08-03 (April 28, 2021) pp. 2–3, 5, 131 (conducting proceeding as contested case when imprudence findings regarding storm response formed basis for binding return on equity reductions under § 16-19e (a) and right to disallow specific storm response and recovery costs or other expenditures sought in future rate proceedings); Decision and Order, Public Utilities Regulatory Authority, "PURA Investigation into Redesign of the Residential Electric Billing Format—Review of Summary Information, Implementation and Display," Docket No. 14-07-19RE05

---

[19] Because PURA assessed that civil penalty in a contested case, the plaintiff had the opportunity to file an administrative appeal to challenge that final decision, which it did not do.

(December 19, 2018) p. 34 (providing for subsequent contested case to review prudence of regulated utilities' ordered system redesign costs and to allocate binding cost responsibility to suppliers); Decision and Order, Public Utilities Regulatory Authority, "PURA Investigation of Public Service Companies' Response to 2011 Storms," Docket No. 11-09-09 (August 1, 2012) p. 16 (declining to "make determinations on issues of prudent and efficient management or associated cost disallowances" when contested proceeding was not noticed to include such issues, explaining that "[a] finding of imprudence *with* associated economic penalties or cost recovery disallowances requires . . . due process notice" (emphasis added)). Although the plaintiff relies on these decisions to support its argument that PURA "always render[s] prudence findings in contested proceedings"; (emphasis omitted); we note that each of the decisions cited involved proceedings in which PURA made, or expressly deferred making, prudence findings because those findings would be used in the same proceeding to affect rate-making, cost allocation, or the imposition of economic penalties or disallowances.

Furthermore, even if it is PURA's usual practice or policy to make prudence determinations exclusively in contested cases, the plaintiff does not point to—and there does not appear to be—any statutory or regulatory requirement that it do so.[20] A finding of imprudence

---

[20] We note that this is the second case in the past year in which a regulated entity has argued that PURA effectively changed the rules of the game without prior notice. See *Aquarion Water Co. of Connecticut* v. *Public Utilities Regulatory Authority*, 352 Conn. 381, 398–402, 337 A.3d 1071 (2025*)* (addressing claim that PURA, without notice, required greater evidentiary showing to establish prudence for certain plant additions than for others within same proceeding). Although PURA's past practices do not necessarily bind it in subsequent proceedings; see, e.g., *GenConn Energy, LLC* v. *Public Utilities Regulatory Authority*, 348 Conn. 532, 551–52, 308 A.3d 1018 (2024); PURA should understand that regulated entities may adjust their conduct and evidentiary presentations in reliance on those past practices. See *Dept. of Homeland Security* v. *Regents of the University of California*, 591 U.S. 1, 30, 140 S. Ct. 1891, 207 L. Ed. 2d 353 (2020) ("[w]hen an agency changes course . . . it must be cognizant that [long-standing] policies may have engendered serious reliance interests that must be taken into account" (internal

without an accompanying penalty is evaluative rather than adjudicative; it expresses PURA's assessment of a party's conduct but does not, itself, determine a party's legal right, duty, or privilege.

Moreover, PURA concedes that, because this matter was not a contested case, its imprudence finding is not binding on the plaintiff in future proceedings.[21] "As a general proposition, the governing principle is that administrative adjudications have a preclusive effect when the parties have had an adequate opportunity to litigate." (Internal quotation marks omitted.) *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care*, 226 Conn. 105, 129, 627 A.2d 1257 (1993). PURA expressly acknowledges that, "if the investigation were to have any effects on the next rate case, the [plaintiff] can litigate the issue again [in that case]," and, accordingly, the plaintiff will have the opportunity to defend the prudence of its response to the Norfolk accident, at that time, if it so chooses.

We recognize that PURA uses findings of imprudence in evaluating the rates it permits a regulated utility to charge and that such findings may affect that utility's rights, duties, or privileges in a future rate case or other proceeding. See *Aquarion Water Co. of Connecticut* v. *Public Utilities Regulatory Authority*, 352 Conn. 381, 390, 337 A.3d 1071 (2025) ("PURA's rate-making authority is governed by the statutory factors set forth in § 16-19e (a), which require PURA to ensure, among other things . . . that the level and structure of rates charged customers . . . reflect prudent and efficient management of the franchise operation" (citation omitted; internal quotation marks omitted)). When PURA makes or relies on imprudence findings in a proceeding in which it determines rates, however, that rate-making proceeding plainly falls within the definition of a contested case

---

quotation marks omitted)). In that regard, the absence of advance notice of material changes in its approach might, in some circumstances, raise concerns about the fairness of the proceeding.

[21] In light of this concession, the statement in PURA's final decision that the plaintiff "had a full and fair opportunity to present evidence on the reasonableness and prudence of its response" to the Norfolk accident is entitled to no weight in any future agency proceeding.

under § 4-166 (4). Accordingly, because the prudence determination at issue in this appeal was not made in a contested case, the plaintiff is not foreclosed from challenging such a claim should PURA make it and seek to rely on it in a future rate-making proceeding or other contested case in which the plaintiff's legal rights, duties, or privileges are adjudicated.[22]

Thus, neither the order imposing the thirty minute target nor the finding that the plaintiff acted imprudently in response to the Norfolk accident are determinations that PURA was statutorily or regulatorily required to make in a contested case.

Finally, the plaintiff contends that, even if General Statutes §§ 16-14 and 16-18, or § 16-1-116 or § 16-1-117 of the Regulations of Connecticut State Agencies, or any other statute or regulation did not confer contested case status, PURA nevertheless adjudicated its legal rights, duties, or privileges within the meaning of § 4-166 (4) by ordering the plaintiff to reduce its priority 1 response time to thirty minutes and finding that the plaintiff's procedures and actions in response to the Norfolk accident were imprudent.[23] However, the

[22] Because we agree that the plaintiff did not have "an adequate opportunity to litigate" the prudence of its response to the Norfolk accident, the prudence determination made in this case has no preclusive effect. (Internal quotation marks omitted.) *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care*, supra, 226 Conn. 129. Accordingly, PURA may not treat the finding of imprudence made in the present case as conclusive in any subsequent rate-making proceeding; rather, PURA would be required to introduce evidence supporting an allegation of imprudence in the new contested case proceeding, and the plaintiff would be entitled to contest and rebut that evidence. See General Statutes § 4-177c (a); see also footnote 21 of this opinion.

[23] The plaintiff contends that PURA imposed "an arbitrary and ill-conceived" thirty minute response time target without affording the plaintiff an opportunity to present evidence regarding "obvious road safety concerns . . . ." In particular, the plaintiff challenges the fact that it was not permitted to produce evidence about the safety concerns associated with operating a 10,000 pound bucket truck on narrow roadways to get to accident locations within the target time frame while complying with all traffic rules and without lights or sirens. We appreciate that unanticipated traffic or road conditions may, in some

fact that PURA may have adjudicated a party's rights, duties, or privileges does not trigger contested case status, unless accompanied by a statutory or regulatory requirement that it do so only after an opportunity for a hearing. See, e.g., *High Watch Recovery Center, Inc.* v. *Dept. of Public Health*, supra, 347 Conn. 328–29. Section 4-166 (4) expressly provides that a contested case is "a proceeding . . . in which the legal rights, duties or privileges of a party *are required by state statute or regulation* to be determined . . . after an opportunity for hearing . . . ." (Emphasis added.) In other words, the fact that legal rights, duties, or privileges are determined is a necessary but not sufficient predicate to qualify as a contested case.[24] Because PURA was not required by

circumstances, make it difficult—or even impossible—for a response specialist to reach an accident location within thirty minutes.

Even so, there are two difficulties with the plaintiff's argument. First, the plaintiff's position does not fully account for the regulatory context in which the plaintiff operates. As a public utility company operating as a monopoly, the plaintiff is subject to PURA's broad regulatory authority and ongoing oversight, including, as discussed previously in this opinion, the power to monitor the manner of the plaintiff's operation and to order operational changes as may be reasonably necessary in the public interest, pursuant to § 16-11. If there is to be a change in this regulatory scheme, it must be undertaken by the legislature, not this court. Second, the response time target of thirty minutes for priority 1 calls is just that—a *target*. In its final decision, PURA recognized that circumstances outside of the plaintiff's control, "such as weather conditions, traffic conditions, and the existence of simultaneous [p]riority 1 events, may prevent the [plaintiff] from meeting the [thirty minute] [t]arget. Accordingly, if the [plaintiff's] response time is in excess of the [thirty minute] [t]arget . . . [the plaintiff] shall include in . . . [its] [i]mmediate and [f]ive [d]ay [a]ccident [r]eports . . . a detailed explanation of the circumstances that prevented the [plaintiff] from meeting the . . . [t]arget, and attach to the reports any and all documentation in support thereof." Indeed, during oral argument before this court, counsel for PURA acknowledged that the thirty minute target cannot be enforced as a hard-and-fast "rule" because PURA did not promulgate it through the formal regulatory process. Accordingly, counsel explained, if PURA were to file a notice of violation based on a failure to meet the target, it would be required to hold a hearing at which the plaintiff could challenge the propriety of the thirty minute target and explain the circumstances surrounding any alleged noncompliance.

[24] Although the plaintiff argues that PURA adjudicated its rights, duties, or privileges, it does not contend that the absence of judicial

state statute or regulation to make the two determinations challenged on appeal after the opportunity for a hearing, this argument fails.

In sum, we conclude that the proceeding conducted by PURA does not qualify as a contested case under §4-166 (4), and, thus, the plaintiff was not entitled to appeal from PURA's decision pursuant to §4-183 (a). Accordingly, the Superior Court properly granted PURA's motion to dismiss the plaintiff's administrative appeal for lack of subject matter jurisdiction.

The judgment is affirmed.

In this opinion the other justices concurred.

---

review of such determinations violates its fundamental right to due process. In any event, as we previously discussed; see footnotes 21 and 22 of this opinion; the finding of imprudence in this case may not be used to the plaintiff's detriment, unless PURA raises it anew in a subsequent contested proceeding, at which the finding would then be subject to challenge and review. Likewise, the same is true with respect to a claimed violation of the thirty minute target. See footnote 23 of this opinion.